Justice HUDSON dissenting.
Here the majority concludes that plaintiff's complaint fails to adequately allege actual control by BAT over the Reynolds board of directors in the context of the Lorillard acquisition and that, as a result, we need not decide whether, in accordance with Delaware courts that have addressed the issue, "a minority stockholder may owe fiduciary duties to other stockholders based on its exercising actual control over the board of directors." Accordingly, the majority holds that the Business Court properly dismissed plaintiff's breach of fiduciary duty claim against BAT. In my opinion the complaint sufficiently alleges actual control by BAT; therefore, I would proceed to address whether this Court follows the Delaware approach on the issue of whether a minority stockholder who exercises actual control over the board of directors owes fiduciary duties to other stockholders. As such, I respectfully dissent.
The relevant inquiry in reviewing a trial court's ruling on a motion to dismiss under Rule 12(b)(6) is "whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon *744 which relief may be granted." Newberne v. Dep't of Crime Control & Pub. Safety , 359 N.C. 782, 784, 618 S.E.2d 201, 203 (2005) (quoting Meyer v. Walls , 347 N.C. 97, 111, 489 S.E.2d 880, 888 (1997) ). Under N.C.G.S. 1A-1, Rule 8(a)(1) (2017), a complaint must contain "[a] short and plain statement of the claim sufficiently particular to give the court and the parties notice of the transactions, occurrences, or series of transactions or occurrences, intended to be proved showing that the pleader is entitled to relief." (Emphasis added.) "The system of notice pleading affords a sufficiently liberal construction of complaints so that few fail to survive a motion to dismiss." Wray v. City of Greensboro , 370 N.C. 41, 46, 802 S.E.2d 894, 898 (2017) (quoting Ladd v. Estate of Kellenberger , 314 N.C. 477, 481, 334 S.E.2d 751, 755 (1985) ); see also id. at 50, 802 S.E.2d at 900 ("In light of the low bar for notice pleading under Rule 12(b)(6), ... the averments in plaintiff's first amended complaint are sufficient **627 ...."). "The complaint should be liberally construed and should not be dismissed 'unless it appears beyond doubt that the plaintiff could prove no set of facts in support of his claim which would entitle him to relief.' " Turner v. Hammocks Beach Corp. , 363 N.C. 555, 559, 681 S.E.2d 770, 774 (2009) (quoting State ex rel. Cooper v. Ridgeway Brands Mfg., LLC , 362 N.C. 431, 444, 666 S.E.2d 107, 116 (2008) (brackets omitted) ); see also id. at 559, 681 S.E.2d at 774 (stating that the complaint must be viewed "in the light most favorable to plaintiffs, giving them the benefit of every reasonable inference that can be drawn therefrom"). "We review appeals from dismissals under Rule 12(b)(6) de novo." Arnesen v. Rivers Edge Golf Club & Plantation, Inc. , 368 N.C. 440, 448, 781 S.E.2d 1, 8 (2015) (citing Bridges v. Parrish , 366 N.C. 539, 541, 742 S.E.2d 794, 796 (2013) ).
I agree with much of the majority's discussion of the Delaware approach, under which a minority stockholder is considered to be a controlling stockholder-therefore owing fiduciary duties to other stockholders-if the minority stockholder exercises "domination ... through actual control of corporate conduct." In re Morton's Rest. Grp. S'holders Litig. , 74 A.3d 656, 664 (Del. Ch. 2013) (quoting Citron v. Fairchild Camera & Instrument Corp. , 569 A.2d 53, 70 (Del. 1989) ); see also id. at 664-65 ("[T]he Complaint must contain well-pled facts showing that the minority stockholder 'exercised actual domination and control over ... [the] directors.' " (second and third alterations in original) (quoting In re Sea-Land Corp. S'holders Litig. , Civ.A. No. 8453, 1988 WL 49126, at *384 (Del. Ch. May 13, 1988) ) ). A complaint must allege facts from which it is reasonable to infer that the allegedly controlling stockholder could "prevent the [company's] board from freely exercising its independent judgment in considering the [transaction] or ... exact retribution by removing the [company's] directors from their offices." In re KKR Fin. Holdings LLC S'holder Litig. , 101 A.3d 980, 995 (Del. Ch. 2014), aff'd sub nom. Corwin v. KKR Fin. Holdings LLC , 125 A.3d 304 (Del. 2015). A plaintiff is not required to plead actual control by a minority stockholder of the "day-to-day operations" of the board of directors; rather, a "[p]laintiff can survive the motion to dismiss by alleging actual control with regard to the particular transaction that is being challenged." Williamson v. Cox Commc'ns, Inc. , No. Civ.A. 1663-N, 2006 WL 1586375, at *4 (Del. Ch. June 5, 2006) (citing In re W. Nat'l Corp. S'holders Litig. , No. 15927, 2000 WL 710192, at *20 (Del. Ch. May 22, 2000) ); see also Super. Vision Servs. v. ReliaStar Life Ins. Co. , No. Civ.A. 1668-N, 2006 WL 2521426, at *4 (Del. Ch. Aug. 25, 2006) (explaining that "pervasive control over the corporation's actions is not required" and a plaintiff can allege " 'actual control with regard to the particular transaction that is being challenged' " (quoting Williamson , 2006 WL 1586375, at *4 ) ).
**628 Here the allegations of control are "with regard to a particular transaction that is being challenged"-the Lorillard acquisition. Among the allegations that in my view sufficiently allege actual control by BAT are the following[1] :
*745 5. As a July 15, 2014 CNBC story put it, "the real victor" in the Proposed Transaction is neither Reynolds nor Lorillard, but BAT, which "solidified its position in a larger company without paying a premium. " The Proposed Transaction enriches BAT by extracting and transferring value from all other Reynolds shareholders (the "Public Shareholders") to BAT. As a result of the Proposed Transaction, the Public Shareholders will not only lose out on the economic value of the "game changing" e-cigarette and heat-not-burn technology being transferred to BAT, but their share of the combined company will be notably diluted and they will lose out on the control premium that BAT should have been required to pay to maintain its effective control over the Company.
....
34. In addition to the power to designate five board members, the Governance Agreement gives BAT significant additional means by which it exerts control over Reynolds. For example, as Reynolds disclosed in its most recent Form 10-K, BAT has a veto over "the sale or transfer of certain RAI intellectual property associated with B&W brands having an international presence, other than in connection with a sale of [Reynolds]; and [Reynolds's] adoption of any takeover defense measures that would apply to the acquisition of equity securities of Reynolds by [BAT] or its affiliates, other than the re-adoption of the [Reynolds] rights plan in its present form." Moreover, "the approval of a majority of [BAT's] designees on [Reynolds's] Board is required in connection with the following matters: any issuance of [Reynolds] securities in excess of 5% of its outstanding voting stock, unless at such time [BAT's] ownership interest in [Reynolds] is less than 32%; and any repurchase of [Reynolds] common stock, subject **629 to a number of exceptions, unless at such time [BAT's] ownership interest in [Reynolds] is less than 25%."
35. Finally, the mere size of BAT's stake gives it significant control over Reynolds. As the Preliminary Proxy notes, "[u]nless substantially all RAI shareholders other than BAT vote together on matters presented to RAI shareholders, BAT would have the power to determine the outcome of matters submitted to a shareholder vote, which could result in RAI taking actions that RAI's other shareholders do not support."
36. The Governance Agreement will terminate, however, if BAT owns either 100% or less than 15% of Reynolds. The Governance Agreement will also terminate, automatically, if a third party acquires a majority stake in Reynolds.
....
41. Reynolds's release also disclosed that BAT would receive two significant benefits stemming from the Proposed Transaction that were not shared with Public Shareholders: (i) the Technology Sharing Agreement will give BAT access to Reynolds's "game-changing" e-cigarette technology; and (ii) the BAT Share Purchase will allow BAT to maintain its pre-acquisition share of the Company and avoid being diluted along with the Public Shareholders by purchasing new shares at a discount to the Company's trading price:
.... As part of the transaction, BAT will maintain its 42 percent ownership in RAI through an investment of approximately $4.7 billion (based on RAI's closing share price of $60.16 as of July 2, 2014, the same share price used to determine the stock component of Lorillard shareholders' consideration).
In addition, RAI and BAT have agreed in principle to pursue an ongoing technology-sharing initiative for the development and commercialization of next-generation tobacco products, including heat-not-burn cigarettes and vapor products.
**630 ....
C. BAT's De Facto Control Over the Reynolds Board Enabled It To Dominate The Board's Decision Making Process
42. The "Background of the Merger" section in the Form S-4 that Reynolds filed with the Securities and Exchange Commission on October 17, 2014 (the "Preliminary *746 Proxy") underscores that the Proposed Transaction was driven by the interests of BAT, at the expense of the Public Shareholders.
43. BAT was involved in the negotiation of the Proposed Transaction from the beginning. According to the Preliminary Proxy, Reynolds met with BAT before it presented any proposal to Lorillard or Imperial. In discussions between Reynolds and BAT in January 2013, BAT's representatives made clear that BAT would dictate the terms of any transaction:
BAT's representatives reiterated BAT's support, as a RAI shareholder, for a business combination of RAI and Lorillard. They also indicated BAT would wish to maintain its approximately 42% beneficial ownership interest in RAI after the transaction and was willing to provide equity financing for such a transaction in order to maintain its ownership interest. BAT's representatives also stated that decisions as to whether and how to pursue a business combination between RAI and Lorillard were to be made by the RAI board of directors, but that BAT, in its capacity as a substantial financing source and holder of contractual approval rights, would cooperate with combining the companies only on transactional terms and with an execution strategy of which it approved. Such issues included, among others, the brands to be divested, the subscription price for any additional BAT investment, maintaining the terms of the governance agreement, avoiding a RAI commitment to pay any material 'reverse termination fee' due to the failure to obtain regulatory clearance and an executive succession plan for the combined company.
**631 44. In June 2013, BAT and RAI agreed to a term sheet "with respect to the subscription by BAT for additional shares of RAI common stock in order to provide financing for the potential transaction involving RAI and Lorillard and to maintain BAT's approximately 42% beneficial ownership interest in RAI" (the "2013 Term Sheet"). At "the insistence of BAT," the 2013 Term Sheet included a provision "that neither BAT nor RAI would seek any changes in the governance agreement in connection with the possible acquisition of Lorillard." The Preliminary Proxy does not disclose any other material terms of the 2013 Term Sheet.
45. According to the Preliminary Proxy, the 2013 Term Sheet was approved by a vote of "the independent directors of RAI [i.e. , directors who are neither officers nor employees of Reynolds] not designated by B&W, referred to as the Other Directors." Yet there is no indication in the Preliminary Proxy that the Other Directors hired independent counsel or an independent financial advisor to assist them in evaluating or negotiating the 2013 Term Sheet.
46. Indeed, it does not appear that the Other Directors played any significant role in the negotiations with BAT over the 2013 Term Sheet. Rather, according to the Preliminary Proxy, the Board established a strategic matters review committee ("SMRC"), which existed and operated on behalf of Reynolds from September 2012 to May 2014. The Preliminary Proxy does not disclose the members of the SMRC. Between September 2012 and the signing of the 2013 Term Sheet in June 2013, Reynolds's primary negotiator was Daniel M. Delen, the then-CEO of Reynolds. Mr. Delen worked for BAT from 1989 through 2006.
47. Later in the summer of 2013, "representatives of BAT indicated to representatives of RAI that BAT was not prepared to provide financial support to a transaction that would include a divestiture of the 'e-vapor' brand blu, as requested by Imperial, although eventually it changed its position." Reynolds and BAT then worked hand-in-hand to negotiate the divestments. According to the Preliminary Proxy, "[i]n July 2013, with the support of the RAI board of directors, [Thomas R.] Adams [an RAI executive], along with Scott M. Hayes, then group head of mergers & acquisitions for BAT, contacted representatives of **632 another potential divestiture partner to inquire about the possibility of such party's participation in a brand divestiture transaction." *747 48. Mr. Hayes continued to function as a de facto member of the Reynolds team. According to the Preliminary Proxy, on November 21, 2013, Reynolds's SMRC met with "representatives of RAI's senior management, [Reynolds's legal advisors] Jones Day, [and] Richards Layton and [Reynolds's financial advisor] Lazard. Mr. Hayes also participated in part of the meeting." And, "[a]t the request of the SMRC, Mr. Hayes presented BAT's view of a possible transaction with Lorillard and expressed BAT's support for such a transaction."
49. BAT continued to give strong direction to the Reynolds Board. On December 4 and 5, 2013, "the RAI board of directors met ... with representatives of Jones Day, Richards Layton and Lazard. ... Representatives of BAT provided BAT's view of the potential transaction, including BAT's belief that the transaction was value enhancing for all RAI shareholders and important from a competitive perspective and that, given the status of discussions with Imperial, BAT supported renewing contact with Lorillard." After that presentation, "the RAI board of directors authorized Mr. Wajnert to contact Mr. Kessler [Lorillard's Chairman and CEO] to explore the possibility of a potential transaction between RAI and Lorillard on the terms reviewed at the meeting."
50. According to the Preliminary Proxy, on December 19, 2013, Mr. Wajnert conveyed the following proposal to Mr. Kessler:
• the proposed business combination would be a market based transaction structured in a manner similar to a 'merger-of-equals,' in which Lorillard shareholders would receive consideration consisting of a mix of cash and stock at market value without a premium and both Lorillard's and RAI's shareholders would realize future value creation through the realization of meaningful synergies and changed market dynamics;
**633 • BAT would maintain a significant beneficial ownership interest in the combined company, including through an investment of approximately $4.5 billion in cash at the consummation of the proposed business combination transaction;
• the leadership and governance of the combined company would be structured as a balance between the two organizations, subject to BAT's expressed desire to preserve its right to designate five members to the board of directors of the combined company (three of whom would be required to be independent of both BAT and the combined company); and
• in connection with a proposed business combination, RAI's subsidiaries' WINSTON, SALEM and KOOL and Lorillard's Maverick cigarette brands and Lorillard's 'e-vapor' brand blu (including SKYCIG) would be divested to Imperial in an effort to enhance the receipt of antitrust clearance from the regulatory authorities.
51. After discussions amongst the Lorillard Board, Mr. Kessler contacted Mr. Wajnert on January 11, 2014 to inform him that "while the Lorillard board of directors was potentially interested in the strategic and long-term financial aspects of a potential business combination between the companies, they did not think the RAI proposal provided sufficient value to Lorillard shareholders. Mr. Kessler indicated, however, that the Lorillard board of directors was willing to explore a business combination that was structured like a 'merger-of-equals' if the key terms were improved[.]"
52. According to the Preliminary Proxy, the Reynolds Board met by phone on January 14, 2014. At that meeting, "[a] representative of Lazard reported that he had contacted representatives of UBS Limited and Deutsche Bank AG, financial advisors to BAT, referred to as UBS and Deutsche Bank, respectively, to discuss potential **634 pro forma ownership." There is no indication that any of the BAT Designees recused themselves from this call. It appears that the Other Directors had not retained independent counsel or an independent financial advisor prior to Lazard initiating negotiations with UBS and *748 Deutsche Bank regarding BAT's stake in the combined company.
53. Indeed, the Preliminary Proxy does not reference any separate action by the Other Directors-other than a separate vote on the 2013 Term Sheet-until January 18, 2014, more than a year after serious discussions began. On January 18, 2014, the Other Directors held a telephone meeting with Lazard, Jones Day, and Richards Layton separately from the other Reynolds directors.
54. That same day, a "representative of Lazard ... introduc[ed] a [possible] alternative approach in which cash available as consideration would be distributed on a pro rata basis to Lorillard shareholders and to RAI shareholders other than BAT." Lazard also reported on discussions regarding "potential solutions that would be in the best interests of RAI shareholders other than BAT and continue to meet the objectives of both Lorillard and BAT. These discussions included the possibility that BAT and/or RAI shareholders other than BAT could have decreased post-closing ownership interest in the combined company." This appears to be the first time that the Reynolds Board considered the obvious tension between the interests of BAT and the Public Shareholders.
55. According to the Preliminary Proxy, the Other Directors did not discuss obtaining independent counsel until February 2014. During meetings between February 4 and 7, 2014, "[r]epresentatives of Lazard presented a variety of modifications to the proposal made in December in connection with the exploration of an alternative proposal to present to Lorillard. The modifications considered included providing a premium on cash paid to Lorillard shareholders, a premium on shares of RAI common stock issued, changes to the BAT investment and incremental changes to RAI's leverage and cash allocation. It was the consensus of the Other Directors that RAI shareholders other than BAT should receive at least 30% of the equity ownership of the combined company and receive a pro **635 rata portion of the cash distribution . The Other Directors discussed engaging independent legal counsel."
56. The Other Directors finally engaged separate legal counsel on February 12, 2014-retaining Moore & Van Allen. Based on the Preliminary Proxy, however, it appears that the Other Directors never retained any independent financial advisors. Moreover, as set forth below, Moore & Van Allen appears to have frequently been excluded from crucial negotiations.
57. At the February 12, 2014 meeting of the Other Directors, "[t]here was extensive discussion regarding the consideration to be received by RAI shareholders other than BAT and BAT's willingness to move from its initial position regarding post-transaction equity ownership." According to the Preliminary Proxy, later in February 2014, there were discussions regarding a proposal to provide extra equity to Lorillard shareholders by reducing BAT's stake: "the ownership level of Lorillard shareholders in the combined company would be approximately 36.5%, with RAI shareholders other than BAT and BAT holding approximately 30% and 33.5% of the outstanding common stock of the combined company, respectively" (subject to a provision allowing BAT to subscribe for additional shares in phases over two years).
58. Ultimately, however, BAT's ironclad control over the Board won out. The Public Shareholders will receive no separate consideration and BAT did not move from its initial position regarding post-transaction equity ownership.
59. Similarly, during the course of discussions in February 2014, "[r]epresentatives of Cravath[, BAT's attorneys,] indicated that BAT was not prepared to extend the standstill covenant in the governance agreement in connection with the proposed business combination transaction[.]" As with its other demands, BAT got its way. The Standstill would still expire on schedule on July 30, 2014.
60. On March 10, 2014, the Lorillard board met and discussed the fact that the proposed transaction was not appropriately viewed as a merger of equals given BAT's control over the combined company.
*749 According to the Preliminary Proxy, Lorillard's board believed that the proposed **636 transaction would not be a merger-of-equals because "BAT would continue to be the most significant shareholder of the combined company with the right to board representation in accordance with the governance agreement and ... BAT would resist agreeing to an extension of the standstill agreement in the governance agreement[.]"
61. On March 13, 2014, the Lorillard board "determined not to proceed with the proposed business combination transaction and to terminate the related discussions with RAI, BAT and Imperial. Among other things ... the Lorillard board of directors did not believe that the proposed transaction in fact reflected a 'merger-of-equals'-like transaction[.]" Lorillard informed Reynolds of its decisions and discussions between Lorillard and Reynolds ceased until May 10, 2014.
62. On May 1, 2014, Ms. Cameron was elected CEO of Reynolds, following Mr. Delen's retirement.
63. The Preliminary Proxy states that on May 7, 2014, "the Other Directors met with RAI senior management, representatives of RAI's outside legal and financial advisors and Moore & Van Allen to consider further the possibility of an acquisition of Lorillard." The Preliminary Proxy claims that "[t]here was extensive discussion, among other things, of the potential benefits to [the Public Shareholders] of BAT's commitment to purchase additional shares of RAI common stock as part of the financing for the proposed transaction, including that it was unlikely RAI would be able to obtain equity financing from a third party on terms as favorable as those offered by BAT."
64. There is no indication in the Preliminary Proxy, however, that Reynolds, its advisors or the Other Directors had, at this point, (i) compared the terms of BAT's proposed equity financing to potential debt financing options that might be available (including the potential tax benefits thereof); (ii) actually contacted other potential sources of equity financing or (iii) determined that BAT was unwilling to offer more favorable terms.
65. According to the Preliminary Proxy, the Reynolds Board dissolved the SMRC on May 7 or 8, 2014 "in light of the role required by the governance agreement of the **637 Other Directors in considering the transaction and the fact that the SMRC was not otherwise operative at this time." The Preliminary Proxy does not explain why it was appropriate for the SMRC-instead of the Other Directors-to act on behalf of Reynolds, for approximately a year and a half prior to May 2014, during which period all of the fundamental aspects of BAT's role in the Proposed Transaction were negotiated.
66. On May 10, 2014, Mr. Wajnert sent Mr. Kessler a proposal for Reynolds to acquire Lorillard for cash and stock worth approximately $65 per share. The proposal provided for BAT to maintain its 42% stake in exchange for an additional cash investment of approximately $5 billion.
67. Reynolds and Lorillard engaged in negotiations over this proposal between May 15 and May 20, 2014. "Representatives of Centerview [Lorillard's financial advisor] telephoned representatives of Lazard and indicated that Mr. Kessler would be prepared to discuss with the Lorillard board of directors the proposed acquisition if RAI increased its offer to $68 per share."
68. At a May 20, 2014 meeting of the Reynolds Board, Reynolds's Directors "determined it would not agree to a 'reverse' termination fee"-which was, of course, one of BAT's conditions-but authorized a proposal to Lorillard with a range of $67 to $68 per share. The Preliminary Proxy states that, during the discussions, "representatives of BAT on the RAI board of directors reported, on behalf of BAT, support for the proposed transaction at the higher price."
69. The fact that the BAT Designees were designated by BAT does not change the fact that they owed independent fiduciary duties to Reynolds and its public shareholders. It was inappropriate for the BAT Designees to act "on behalf of BAT,"
*750 in any capacity, while acting as members of the Reynolds Board. That the BAT Designees were speaking for BAT while sitting as Reynolds directors in a Reynolds board meeting underscores BAT's dominance over Reynolds's decision making.
**638 70. On May 27, 2014, Reynolds and Imperial executed a non-binding memorandum of understanding with respect to the proposed asset sale. According to the Preliminary Proxy, "Over the next several weeks, representatives of RAI, Imperial, Lorillard, and in some cases BAT, engaged in discussions regarding the divestiture transaction, including with respect to 'route to market,' reciprocal contract manufacturing and other commercial arrangements." Then, "[f]rom June 11, 2014 through July 15, 2014, legal counsel to RAI, BAT and Lorillard, with the assistance of RAI's and Lorillard's senior managements and financial advisors, engaged in extensive negotiations concerning, and exchanged numerous drafts of, the proposed merger agreement and its key terms, including the allocation of antitrust risk and required efforts in the proposed transaction."
71. The Preliminary Proxy identifies only one specific recommendation made by the Other Directors during this period. That recommendation was ultimately rejected. According to the Preliminary Proxy, "on July 2, 2014, Moore & Van Allen reviewed the proposed draft of the subscription and support agreement with the Other Directors, who requested that BAT's draft provision for an unconditional commitment to vote the shares of RAI common stock it beneficially owned in favor of the transaction (regardless of any change in recommendation of the RAI board of directors) be deleted." Yet, on July 5, 2014 "Simpson Thacher [counsel for Lorillard] advised Jones Day [counsel for Reynolds] that Lorillard was insistent, as a condition of proceeding, on having a commitment from BAT to vote the shares of RAI common stock it beneficially owned in favor of the transaction even if the RAI board of directors changed its recommendation of the transaction. Cravath [counsel for BAT] advised Jones Day that BAT would consider this demand but would not give such a commitment over the objections of the Other Directors. The Other Directors agreed to accept that commitment."
72. The Preliminary Proxy suggests that even after Moore & Van Allen-independent counsel to the Other Directors-was retained, the firm was frequently excluded from discussions amongst counsel for the parties. For example:
**639 • Between February 20 and February 24, 2014, "representatives of Jones Day [for Reynolds], Cravath [for BAT] and Simpson Thacher [for Lorillard] began to discuss the outlines of other potential terms in the 'merger-of-equals'-like transaction.";
• "[C]ommencing on May 21, 2014, representatives of Jones Day, Cravath and Simpson Thacher began discussing various process matters, including those relating to structure, due diligence, documentation and various matters relating to the Imperial asset divestiture.";
• "On June 3, 2014, representatives of Jones Day, Cravath and Simpson Thacher held a telephonic meeting to discuss certain legal matters, including the potential key terms of the definitive transaction agreements expected to be entered into among the parties, including the allocation of antitrust risk and required efforts."; and
• "On July 5, 2014, ... representatives of Jones Day, Cravath and Simpson Thacher met to discuss the proposed merger agreement, including the allocation of antitrust risk and required efforts in the proposed transaction, and the status of the other definitive transaction documents, including the subscription and support agreement"
73. The Other Directors should have insisted-yet apparently did not-that Moore & Van Allen be included in every discussion amongst counsel for the parties, including those listed above.
*751 74. On July 13 and 14, 2014, the Other Directors reviewed and unanimously approved the Proposed Transaction. They did not retain any independent financial advisor to assist them in evaluating the fairness of the Proposed Transaction to the Public Shareholders. The Reynolds Board also unanimously approved the Proposed Transaction.
**640 II. THE PROPOSED TRANSACTION UNFAIRLY BENEFITS BAT AT THE EXPENSE OF PUBLIC SHAREHOLDERS
A. The Proposed Transaction Will Give BAT Access To Reynolds's "Game-Changing" E-Cigarette Technology Without Adequately Compensating Public Shareholders
....
B. The Proposed Transaction Will Dilute Public Shareholders But Permit BAT To Retain Its Blocking Position Without Paying A Control Premium
....
87. Under the terms of the Subscription and Support Agreement dated as of July 15, 2014, BAT will purchase the additional shares at a reference price of $60.16 per share. This is $3.02 per share less than Reynolds's closing price on July 14, 2014 of $63.18 per share-representing a negative 4.8% premium. In a truly arm's-length negotiation, Reynolds should have required BAT to pay a significant, positive premium to purchase sufficient shares to maintain its controlling blocking position.
Construing the complaint liberally and drawing every reasonable inference therefrom, the complaint alleges that BAT used its significant forty-two percent minority stake (the Preliminary Proxy, incorporated by reference, reveals that the next largest ownership block was five percent) and its veto power over the board to dictate the terms of the Lorillard acquisition in order to enrich itself at the expense of other shareholders, namely, by gaining access to Reynolds's lucrative e-cigarette technology and by maintaining its acquisition share while other shareholders' shares were diluted. The complaint further alleges that BAT employed additional coercive leverage to control the board in the Lorillard acquisition, including by implicitly threatening a takeover of Reynolds made possible by the impending expiration of the Standstill, as well as by acting as a major source of financing for the transaction. The complaint also alleges that during discussions the representatives of BAT on the board spoke "on behalf of BAT," in contravention of their fiduciary duties as board members, further underscoring BAT's coercive influence over the board. Finally, the complaint alleges that, as a result of **641 BAT's control of the board in this transaction, the other board members (several of whom are alleged to have close ties with BAT) delayed in retaining separate legal counsel and then failed to adequately utilize that counsel, never retained an independent financial advisor, never received a separate fairness opinion regarding the BAT share purchase, and never considered other options to finance the transaction besides BAT equity financing. In my view, "[i]n light of the low bar for notice pleading under Rule 12(b)(6)," Wray , 370 N.C. at 50, 802 S.E.2d at 900, these allegations are more than sufficient to allege that BAT exercised actual control over the board and prevented the board from "freely exercising its independent judgment" in considering the Lorillard acquisition.
The majority recognizes that the complaint alleges that BAT possessed significant veto power and used this to its advantage in the transaction, but the majority concludes that in the absence of "other factors," the veto power, as the mere exercise of a contractual right, cannot alone support a finding of actual control. See Super. Vision , 2006 WL 2521426, at *5 ("There may be circumstances where the holding of contractual rights, coupled with a significant equity position and other factors, will support the finding that a particular shareholder is, indeed, a 'controlling shareholder,' especially if those contractual rights are used to induce or to coerce the board of directors to approve (or refrain from approving) certain actions."). In light of the complaint's allegations of the threat posed by an acquisition of Reynolds by BAT, BAT's role as the major source of equity financing, and the alleged "inappropriate"
*752 role played by representatives of BAT on the board, I conclude these allegations include such other factors.
The majority dismisses any alleged leverage over the board posed by the threat of a takeover of Reynolds by BAT, asserting that the complaint merely alleges that news outlets reported on "speculation" of a takeover and that the complaint fails to allege that BAT actually threatened Reynolds with purchasing the remaining shares at the end of the Standstill period. The majority further asserts that "BAT could not seek to remove any of the directors that it did not nominate" and "therefore had no means of retribution against the majority of the directors that could have impaired the ability of those directors to exercise independent judgment." In my view, the majority reads the complaint's allegations regarding the threat of a takeover too narrowly and also ignores the fact that the restriction on BAT's seeking to remove any of the Other Directors, similar to the prohibition on BAT increasing its ownership percentage, was one of the governance agreement restrictions set to expire with the impending cessation of the Standstill period, which, **642 according to the complaint, " 'BAT was not prepared to extend[.]' ... As with its other demands, BAT got its way. The Standstill would still expire on schedule on July 30, 2014." Following the expiration of the Standstill period, BAT could seek the removal of Other Directors, or it could effect their removal by doing precisely what the Standstill had prevented for ten years-acquiring Reynolds. As the complaint alleges, "[t]he timing of the Proposed Transaction is no coincidence." Turning back to the complaint, which alleges regarding the control exercised over the board by the threat of a takeover:
3. The Proposed Transaction is Reynolds's first significant strategic transaction since 2004. The Proposed Transaction was announced just two weeks before the expiration of a ten-year standstill provision (the "Standstill") that prevented BAT from purchasing the Company in its entirety.
4. The timing of the Proposed Transaction is no coincidence. The Proposed Transaction forestalls a takeover by making Reynolds a significantly less attractive takeover target for BAT.
....
A. The Impending Expiration Of The Standstill Put The Directors' Jobs At Risk
32. Reynolds was created as a result of the 2004 acquisition of BAT's U.S. subsidiary, B&W, by Reynolds's predecessor entity, the R.J. Reynolds Tobacco Company. As part of the Brown & Williamson Acquisition, BAT acquired a 42% stake in Reynolds.
33. In connection with the Brown & Williamson Acquisition, BAT and Reynolds adopted a July 30, 2004 Governance Agreement (the "Governance Agreement"), which included a provision that prohibited BAT from increasing its percentage ownership of Reynolds until July 30, 2014-i.e., the Standstill.
....
37. .... BAT cannot replace the Reynolds Board in its entirety without purchasing 100% of the Company.
38. In the weeks leading up to the expiration of the Standstill, there were reports suggesting that BAT might **643 be interested in doing just that. On March 10, 2014, the Telegraph reported that Citigroup analysts had "talked up the likelihood" that BAT would buy the remaining 58% of Reynolds. At BAT's annual shareholder meeting in April 2014, BAT CEO Nicandro Durante made a point of noting that BAT looks at acquiring Reynolds on a yearly basis. Such commentary resurfaced in early July 2014 when the Daily Mail reported on "growing speculation [that BAT] is ready to splash out billions of pounds buying the 58 per cent of US rival Reynolds American it does not already own."
39. At the time of these reports, the Proposed Transaction was already being negotiated. The threat of a complete takeover gave BAT additional leverage to impose its terms on the Reynolds Board during those negotiations.
40. The Director Defendants adopted a plan that had the purpose and effect of allowing them to keep their jobs. On July *753 15, 2014, Reynolds issued a press release announcing the Proposed Transaction[.]
....
93. ....
• All members of the Reynolds Board have an incentive to safeguard their comfortable and lucrative positions, which could be lost in the event of a BAT takeover of Reynolds.
....
97. As detailed in the Company's most recent annual proxy, Reynolds's non-officer directors are paid hundreds of thousands of dollars each year to serve on the Board[.]
(Emphases added.) Construing these allegations liberally, there appears to be more than a reasonable inference that the threat of a takeover of Reynolds by BAT loomed large; indeed, the specter of a BAT takeover would seem to be a familiar shadow to Reynolds by then, given that it was apparently the entire purpose of the ten-year-old Standstill provision. In my view, the distinct message of plaintiff's allegations is that after the expiration of the Standstill period a takeover could well **644 follow along with the loss of a board position if the Other Directors did not agree to BAT's transaction terms in the Lorillard acquisition. These allegations set forth a scenario in which BAT in effect coerced the Other Directors into acceding to exceedingly favorable terms for BAT in order to maintain their positions in the company. The likelihood that plaintiff could ultimately prove these allegations is an entirely different issue, and one on which I express no opinion. The majority appears to focus on likely proof of the allegations, rather than sufficiency of the allegations themselves; our review in accord with Rule 12(b)(6) requires focus on the latter.
In that respect, I note that the majority also asserts that "[p]laintiff does not allege that BAT ever threatened the Reynolds board in any way, however-unlike, for example, the stockholder who was considered controlling in Kahn [ ]-even though BAT was involved in many of the discussions regarding the Lorillard transaction from an early date." See Kahn v. Lynch Commc'n Sys., Inc. , 638 A.2d 1110, 1113-15 (Del. 1994) (concluding that a minority stockholder was controlling when the minority stockholder intimidated the board and at one point threatened them, saying, "[y]ou must listen to us. We are 43 percent owner. You have to do what we tell you."). But Kahn was not decided on a motion to dismiss for failure to state a claim; rather, the Court of Chancery determined that the minority stockholder was controlling after a three-day trial. Id. at 1111. As the majority states, "[t]here was also evidence in Kahn that board members were intimidated by this stockholder and therefore complied with its demands instead of exercising their own independent business judgment." An explicit statement like the one in Kahn , or testimonial evidence that board members were intimidated, would certainly be beneficial to a claimant in plaintiff's position, but these are examples of evidence that will only be made known or available through discovery or at trial.
On the other hand, portions of the complaint pertaining to information available to a stockholder situated like plaintiff are summarily dismissed by the majority. For instance, plaintiff alleges that the other board members delayed in retaining separate legal counsel and then failed to adequately utilize that counsel, never retained an independent financial advisor, never received a separate fairness opinion regarding the BAT share purchase, and never considered other options to finance the transaction besides BAT equity financing. The majority briefly touches on some of these allegations but concludes that because they focus on the actions of the Other Directors rather than on the actions of BAT, these allegations "would in no way show that BAT" exercised actual **645 control of the board in the Lorillard transaction. (Emphasis added.) Given that plaintiff-with his allegations that BAT dictated the terms of the Lorillard transaction by means of its significant forty-two percent minatory stake, its veto power over the board, its role as a major source of equity financing for the transaction, and the threat of a takeover and the termination of the Other Directors following the expiring Standstill, as well as the allegation that BAT's representatives on the Board acted in breach of their fiduciary *754 duties-has alleged that BAT exercised actual control of the board in this transaction, i.e. "prevent[ing] the [company's] board from freely exercising its independent judgment in considering the [transaction]," In re KKR , 101 A.3d at 995, and given that these allegations reflect that the other board members were in fact not "freely exercising [their] independent judgment," id. , I find perplexing the majority's conclusion that such allegations are essentially irrelevant.
Similarly, with regard to the complaint's allegations of the "Technology Sharing Agreement" concerning "the development and commercialization of next-generation tobacco products, including heat-not-burn cigarettes and vapor products," the majority dismisses these allegations with an oft-repeated refrain, stating "[a]gain, though, leverage to obtain favorable terms in an agreement does not necessarily indicate that the beneficiary of those favorable terms was a controlling stockholder." Indeed, in the majority's view, nearly everything can be reduced to the "mere existence of leverage." See In re Sea-Land , 1988 WL 49126, at *3 ("Plaintiffs allege only that LLC and its affiliates had significant 'leverage,' (i.e. , a superior bargaining position) because they owned 39.5% of Sea-Land's stock. But 'leverage' is not actual domination and control."). But as the majority recognizes elsewhere in its opinion, a minority stockholder may employ means beyond its mere ownership percentage or contractual rights that amount to "coercive leverage" and actual control over the board. See Williamson , 2006 WL 1586375, at *5 ("Cox and Comcast's potential veto power is significant for analysis of the control issue, however, because it supports plaintiff's allegation that Cox and Comcast had coercive leverage over At Home. Cox and Comcast had the ability to shut down the effective operation of the At Home board of directors by vetoing board actions. Plaintiff may be able to prove facts showing that this leverage (together with the special business relationships and other circumstances mentioned above) was enough for Cox and Comcast to obtain a far better deal th[a]n they would have in an arm's-length transaction." (emphasis added) ). In light of the allegations of coercive leverage discussed above, I also view as relevant the allegations regarding the "Technology Sharing Agreement," which is alleged to have been significant, if not vital, to the Lorillard transaction;
**646 these allegations demonstrate that BAT was able "to obtain a far better deal th[a]n [it] would have in an arm's-length transaction." Id.
For instance, the complaint included numerous allegations about the importance to Reynolds of its "game-changing" VUSE brand of e-cigarettes, as well as its heat-not-burn technology, asserting that e-cigarettes are "the future of the tobacco industry" and that before the Lorillard acquisition, Reynolds was predicted to "have $4 billion in revenue from e-cigs in 2021, compared with $3.9 billion from conventional cigarettes." The complaint alleges further that news reports prior to the transaction had recognized that "gaining access to Reynolds's e-cigarette and heat-not-burn technology was one of the primary reasons that BAT might want to buy the Company." Due to BAT's control of the board, however, "the Director Defendants have agreed to allow BAT to access Reynolds's game-changing technology without adequate compensation, [and] there is no need for BAT to pay the Public Shareholders a control premium to buy the rest of the Company." The complaint alleges that this "forestalls a takeover by making Reynolds a significantly less attractive takeover target for BAT," or in other words, it allows BAT to "get the milk without buying the cow." Based on these allegations, I disagree with the majority's assertion that "it is unclear how this agreement demonstrates that BAT had actual control of the Reynolds board with respect to the transaction to purchase Lorillard."
In sum, looking solely at the allegations in the complaint and taking them as true, I conclude that plaintiff has sufficiently alleged actual control by BAT over the board in the Lorillard acquisition. As such, I respectfully dissent.
Justices BEASLEY and MORGAN join in this dissenting opinion.

Allegations pertaining to the threat of takeover are summarized with that part of the discussion below.